[Civ. No. 1233.   Third Appellate District.—July 28, 1914.]

## CHARLES A. TABER et al., Respondents, v. PIEDMONT HEIGHTS BUILDING COMPANY (a Corporation), Appellant.

VENDOR AND VENDEE—MISTAKE AS TO LAND PURCHASED—RESCISSION BY VENDEE.—Where intending purchasers of city property visit the premises with the vendor's agent and indicate to him the particular parcel they will purchase and also land they will not purchase, and, upon his mistaken statement that the property they desire is lot number 35, they purchase the lot bearing that number when as a matter of fact such lot embraces a portion of the tract which they have specifically rejected, they are entitled to rescind their purchase.

ID.—SPECULATIVE CONTRACT—EFFECT OF MISTAKE.—In such case the rule does not apply that where parties knowingly enter into a speculative contract or transaction, one in which they intentionally speculate as to the result, and there is an absence of bad faith, violation of confidence, misrepresentation, concealment, or other inequitable conduct, the contract is binding, notwithstanding the mistake of one of the parties.

ID.—RISK OF CONTRACT TURNING OUT IN CERTAIN WAY—RELIEF AGAINST EVENT.—Nor does the rule apply that where each of the parties to a contract is content to take the risk of its turning out in a particular way, chancery will not relieve against the event.

ID.—RESCISSION BY VENDEE—INTEREST—FROM WHAT TIME TO BE COMPUTED.—In an action by such vendees for rescission on the ground of mutual mistake, interest should be allowed only from the date of rescission, there being no allegation of fraud or willful misrepresentation.

APPEAL from a judgment of the Superior Court of Alameda County and from an order refusing a new trial. Wm. S. Wells, Judge.

The facts are stated in the opinion of the court.

Fitzgerald, Abbott & Beardsley, for Appellant.

L. D. Manning, for Respondents.

CHIPMAN, P. J.—This is an action for the rescission of a contract for the purchase of a certain lot designated as lot 35 in block D upon defendant's map of Piedmont Knoll, Oakland, and to recover judgment for the money paid on account of said purchase. Plaintiff had judgment as prayed for from which, and from an order denying its motion for a new trial, defendant appeals.

The pleadings are verified and most of the material averments of the complaint on which plaintiff relies were denied in the answer. As the findings follow quite closely the averments of the complaint the issues will sufficiently appear from the findings of fact, which we proceed to state.

Plaintiffs are husband and wife. Defendant was, at all times mentioned in the complaint, the owner of lots 34 and 35 in said block D, and one Andrew McFarland was defendant's agent with authority "to exhibit the lands and negotiate

agreements of purchase of the lands of defendant." The following sketch of part of block D is necessary to an understanding of the findings and testimony in the case:

On May 10, 1910, plaintiffs inspected the land under the direction of McFarland, "as agent of defendant, for the purpose of selecting, and plaintiffs did then and there select a piece of land and did inform Andrew McFarland as agent for defendant that they selected and would purchase the piece of land on which they then stood; that plaintiffs were at that time unfamiliar with the designations and descriptions of the land, and Andrew McFarland as agent of defendant with intent to induce plaintiffs to purchase a piece of land, paced the distance from a point which he stated to plaintiffs was the probable line of Winsor Avenue and stated the distance to be about 143 feet from Winsor Avenue, and walked over the piece of land so selected by plaintiffs and pointed out to plaintiffs the approximate boundary lines thereof and exhibited to plaintiffs printed copy of the map of Piedmont Knoll and stated to plaintiffs that such piece of land so selected by plaintiffs was designated on said map as lot No. 35 in block 'D.' At that time a person unfamiliar with the

land could not determine the true line of Winsor Avenue or the true lines as designated on the map of the land selected by plaintiffs from an inspection or examination of the land. The plaintiffs relied solely upon such representation of Andrew McFarland and from such recommendations believed that the land selected by them was designated and described as lot 35, block 'D,' on the above mentioned map and were solely induced thereby to execute the contract admitted in evidence, made and entered into on May 10, 1910, and following the selection of such land, by the terms of which contract plaintiffs agreed to purchase and defendant agreed to sell'' the lot above described as lot 35.  ''That on or about September 29, 1911, plaintiffs were informed by said Andrew McFarland as agent for defendant that a mistake had been made in the description of the piece of land selected by plaintiffs and that lot numbered 35 did not designate the land intended to be sold by defendant to plaintiffs and did not include the land selected by plaintiffs.  That plaintiffs thereupon demanded that defendant convey to them the piece of land so selected by plaintiffs, but defendant refused on such demand to convey the land so selected.  That the land selected by plaintiffs lies on the side of a knoll or raise at and above the level of the street and of the surrounding land, excepting a small part in the rear of the lot, and it is desirable for a residence site, while lot number 35 lies adjoining and almost wholly in a hollow or depression below the level of the street and of the surrounding land, is partly filled ground and is less desirable and is of less value for a residence site than the land selected by plaintiffs.  The greater portion of the land selected by plaintiffs would be in lot No. 34 and a small portion in lot 35 of said block D.  That at the time of executing such contract of purchase plaintiffs and Andrew McFarland believed the land described in such agreement as lot numbered 35 was identical with and was the proper description of the piece of land selected by and designated by plaintiffs to Andrew McFarland, as agent of defendant, as the land plaintiffs desired to purchase, and plaintiffs had no knowledge to the contrary until so informed by said Andrew McFarland on or about September 29, 1911. That plaintiffs would not have purchased said lot No. 35 nor have entered into such contract of purchase had they not relied upon and acted upon such representations of Andrew

25 Cal. App.—15

McFarland that plaintiffs were purchasing and entering into an agreement to purchase the land selected by plaintiffs. On October 2, 1911, plaintiffs notified defendant that they rescinded the agreement for the purchase of the land designated as lot No. 35 and plaintiffs offered to restore to defendant everything of value received under the contract by plaintiffs and did tender a transfer in writing executed by plaintiffs conveying and releasing to defendant all interest held by plaintiffs in lot No. 35. That plaintiffs performed all the covenants of the agreement of purchase on their part to be performed and paid $738.48 taxes and installments under the terms of the agreement. The interest accruing on the sum of $738.48 computed from the dates of the payment of the several installments up to October 2, 1911, the date of rescission, is found to be $55.93, and the additional sum of $25.44 interest computed from October 2, 1911, to this date. The allegations of the answer are untrue, except as above found.''

As conclusions of law the court found: ''That the consent of plaintiffs to the above mentioned contract was not mutual; that plaintiffs did not purchase the land now known to be designated and described as lot number 35 in block 'D' on said map, and that the designation in the contract of the land to be purchased as being lot number 35 was agreed to by plaintiffs in the sense of being a description of the parcel of land indicated by plaintiffs to defendant at the time of selection as being the land they intended to purchase. That on October 2, 1911, plaintiffs rescinded such agreement as to lot number 35. That plaintiffs are entitled to judgment as prayed for in the complaint upon conveying to defendant all interest received or held by them in lot No. 35 above mentioned.''

Defendant presents but two questions in its brief. First: ''Can a purchaser of a city lot rescind the purchase upon the ground of mistake in location, when he knew at the time of the purchase that he did not know the location, except approximately; in other words, is section 1577 of the Civil Code to be extended and enlarged so that mistake can be predicated on *conscious* ignorance of a material fact, as well as upon *unconscious* ignorance?'' Second: Where there is no fraud, oppression or malice, is it proper in a suit for rescission to charge interest from the date of payment on the land, and before the plaintiff has elected to rescind and while he is still making his payments and treating the contract as subsisting?

Defendant does not in its brief attack the findings of fact as unsupported by the evidence; indeed, its points are based upon the findings. The argument proceeds upon the assumption that rescission is sought on the ground of mutual mistake which section 1577 of the Civil Code defines ''as an unconscious ignorance or forgetfulness of a fact,'' while it is claimed that ''all the evidence shows that the ignorance was conscious ignorance'' of the location of the lot. ''And there being no *unconscious* ignorance of that material fact, but rather a *conscious* ignorance, there was no mistake at all entering into the contract. The contract was based upon facts that were known to be doubtful. The plaintiffs knowingly made a speculative contract, and now cannot allege mistake simply because they speculated upon the location of the lot and do not now know and never knew its exact location.''

Defendant brings to its aid the rule as stated in 9 Cyc. 398: ''Where the parties treat upon the basis that the fact is doubtful, and the consequent risk each is to encounter is taken into consideration in the stipulations assented to, the contract will be valid, notwithstanding any mistake of one of the parties.'' The rule is elaborated in 2 Pomeroy on Equity Jurisprudence, sec. 855, quoted in *Colton* v. *Stanford,* 82 Cal. 351, 388, 389, [16 Am. St. Rep. 137, 23 Pac. 16]. The cases put by Mr. Pomeroy presuppose ''an arrangement based upon uncertain or contingent events purposely as a compromise of doubtful claims arising from them, and where parties have knowingly entered into a speculative contract or transaction—one in which they intentionally speculated as to the result—and there is in either case an absence of bad faith, violation of confidence, misrepresentation or concealment or other inequitable conduct.'' ''In such classes of agreements and transactions,'' says the learned author, ''the parties are supposed to calculate the chances, and they certainly assume the risks, breach of confidence, misrepresentation, culpable concealment, or other like conduct amounting to actual or constructive fraud.'' Defendant still further relies upon the rule as stated in *Ashcom* v. *Smith,* 2 Pen. & W. (Pa.) 211, [21 Am. Dec. 437], where acreage was estimated. The court said: ''Equity will indeed relieve against a plain mistake, as well as against misrepresentation and fraud. But can mistake be alleged in a matter which was considered doubtful, and treated accordingly? Where each of the parties is con-

tent to take the risk of its turning out in a particular way, chancery will certainly not relieve against the event.''

The difficulty we find is in applying these very sound equitable principles to the evidence and findings of fact in the present case. The testimony of both plaintiffs, corroborated by friends who were present when they all went together with Mr. McFarland to view the lot, is very clear that plaintiffs distinctly pointed out to McFarland the particular piece or parcel of land and no other that they were willing to purchase which turned out to be lot 34 instead of lot 35. They as distinctly told McFarland that they would not purchase the land which all present saw lay west of the land selected and ''down in a swale or draw,'' some twenty-five feet below the street grade. Plaintiff Charles A. Taber testified: ''He, McFarland, had his map with him and he said the corner lot which faced east and the key lot (34) immediately back of it, according to his map, were sold, but he said 'This lot here'— of course, while he had his map, and the numbers on it, I didn't pay any particular attention to the numbers because I was looking at the ground and noticing the topography of it and he stepped it off in a way. He said 'Now this lot is 50 by 178 feet' and I said 'Does any of it go down in that swale or draw?' He says 'No, not a bit of it, the west line of the lot as you will see, is right along the edge of it.' Well, I went to stepping it off. He says 'It is 140 feet from the corner lot but I can't locate the corner very well as the road has not been laid out as it should be, and we haven't the lines yet.' Well he paced it off and seemed satisfied with it and I saw him go down into the fill just below the western edge of this high ground. I said 'Now, we don't want to go down there at all.' He said, 'No, you are not coming down here at all.' And we were very well satisfied with it; we agreed on the terms, and got into the machine and drove back home. He wrote out a receipt for the money that we were to pay at that time, and I thought no more about it, leaving it entirely to Mrs. Taber.'' Mrs. Taber testified: ''About the 10th of May, 1910, we all went out with Mr. McFarland in the automobile, Mr. Taber and Mr. Neece and my daughter and myself, and Mr. McFarland showed us the lot, and we said immediately that we would like that lot there, but we did not want the one in the hollow, that we wouldn't have it under any considerations. Mr. McFarland said 'We are

standing right on the lot.' And we walked to the back of the lot and all around, and we said 'Are you sure this is the right lot?' and he said 'Yes.' I saw them pacing it off but I didn't know anything about pacing." Some months later, Mrs. Taber thought it was in February, she went to McFarland's office to pay her monthly installment and said "Mr. McFarland, I think there is some mistake about the lot. He says, 'Oh, Mrs. Taber, don't worry, it is all right.' I says, 'Mr. McFarland, is it on the top of the hill, on the very ridge?' and he said 'Yes.' I says, 'It is not the one in the hollow, is it?' and he says, 'No.' It was along in February, I guess, that we had this conversation. The first time I asked him to go out and see about it, and he said for me to go, he said for me not to worry." At another point in his testimony Mr. Taber testified: "From our standpoint the lot that we selected was the only one of the two that we would care to consider at all. We made that point very clear to Mr. McFarland. I was standing on the fill just to the west of the lot we were selecting and looking at and I told him that we didn't want to go down there at all under any circumstances. He says, 'No, your line is just east of this.' "

It is very certain that plaintiffs did not believe that they had "knowingly entered into a speculative contract or transaction—one in which they intentionally speculated as to the result," a condition which Mr. Pomeroy says is essential to the application of the rule relied upon by defendant. Nor was this (the location of the lot) "a matter which was considered doubtful and treated accordingly, where each of the parties" was "content to take the risk of its turning out in a particular way," as was essential to the rule given in *Ashcom* v. *Smith*, 2 Pen. & W. (Pa.) 211, [21 Am. Dec. 437].

Much reliance is placed by appellant upon the finding 10, "that at the time of executing such contract of purchase plaintiffs and Andrew McFarland believed the land described in such agreement as lot number 35 was identical with and was the proper description of the piece of land selected by and designated by plaintiffs to Andrew McFarland, as agent of defendant, as the land plaintiffs desired to purchase." McFarland's belief may acquit him of intentional misrepresentation or fraud and we think the finding should be so understood, but as the sales agent of defendant his belief does not acquit him of having sufficient knowledge or means of

knowledge as to the location of the subdivided tracts he was selling to warrant his giving the assurances on which plaintiffs founded their belief and on which they relied and paid their money. The finding that they believed that they were getting the land they selected and pointed out to McFarland is entirely consistent with the finding that they were acting upon his confident assurance rather than upon any belief they may have had, and the evidence in no wise tends to show that as to the location of the lot they were intentionally speculating or that they were taking the risk of getting the piece of land they selected. Plaintiffs had a right to rely upon the representations of defendant's agent "and the vendor cannot escape responsibility by showing that the purchaser might have ascertained that such representations were untrue." (*Morris* v. *Courtney*, 120 Cal. 63, [52 Pac. 129].)

The court made a finding of unpaid accrued interest to the date of rescission, to wit, $55.93, and interest computed from date of rescission to date of the judgment, to wit, $25.44. There is no allegation in the complaint of fraud or willful concealment or misrepresentation of facts and there is no such finding. The court found that McFarland believed that the land selected by plaintiffs was the land intended in the contract. In this he was mistaken but, so far as appears, honestly mistaken. There was no rescission until October 2, 1911, and it seems to us the rule warrants no interest prior to that date. It is true that section 3288 of the Civil Code, provides that, "In every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury." We find nothing in the pleadings, evidence or findings justifying the claim that any one of these elements entered into the transaction. *Kiger* v. *McCarthy Co.*, 10 Cal. App. 308, [101 Pac. 928], bears no resemblance to the case here; nor does *Morris* v. *Courtney*, 120 Cal. 63, [52 Pac. 129]. There was nothing due plaintiffs from defendant until they rescinded and the action then was for money had and received and not on the contract. In the absence of an agreement to pay interest, the law only awards interest upon money from the time it becomes due. (Civ. Code, sec. 1917; *Hayt* v. *Bentel*, 164 Cal. 680, [130 Pac. 432].) The error may be corrected upon the appeal from the judgment inasmuch as it clearly appears from the findings and may be corrected by an amendment to the judgment.

Interest prior to October 2, 1911, will be stricken out of the judgment and otherwise the judgment and order are affirmed.

Hart, J., and Burnett, J., concurred.