270 P.2d 425

BROOKS et ux. v. JENSEN et al,

No. 8036.

Supreme Court of Idaho.

May 5, 1954.

202

Robert M. Kerr, Jr., Blackfoot, for appellants.

Donald R. Good, Blackfoot, for Jensens.

Marion J. Callister, Blackfoot, for Callisters and Owens.

GIVENS, Justice.

Respondents, through one Dale, a licensed real estate broker, negotiated in August and September 1951 for the sale to appellants of the:

"N½NE¼, Sec. 8, Tp. 2 So., R. 35 E.B.M., less the following tract: Beginning at the NE corner of the NE¼ of said Sec. 8; thence So. 20 rods; thence West 24 rods; thence No. 20 rods; thence East 24 rods to the place of beginning. Also the NW¼NW¼, Sec. 9, said Township and Range, less the following tract: Commencing at the NW corner of the NW¼ of said Sec. 9, and running thence due South on the Section line 400 feet, thence due East at right angles to said last named course, 655 feet, thence due North 400 feet to a point on the North line of said Sec. 9, 655 feet East of the point of beginning, thence West on the North Section line of said Sec. 9, 655 feet to the point of beginning."

and appurtenant water rights.

A resulting, valid, written contract was consummated September 10, 1951.

The total purchase price was $20,000; $1,500 on delivery of the contract; $3,500 January 5, 1952; balance in annual instalments of $2,000 at five percent interest beginning on or before the 15th of October 1952, and assumption by appellants of a mortgage to the Prudential Life Insurance Company with a balance due thereon of $4,750; respondents to pay taxes for 1951 and appellants for 1952 and on. Time was of the essence with forfeiture clause for default, and retention of payments as liquidated damages. There were other provisions pertinent to a real estate contract, but not involved herein. Possession was to be given November 1, 1951, but was taken October 27.

March 14, 1952 appellants sued for rescission of the contract alleging various false representations, only one of which need be considered, namely, that a fence south of the East forty and a ditch and dyke extending west from the Weggland Lateral in the eastern part of said forty were represented as the south boundary line of the described forty in Section 9; that is, that the ditch and dyke were on the land being bought, when in fact they were not, and the fence throughout its full course was not the correct boundary line, but in part south of a triangular piece of land approximately 330 feet long, of no width at the west end and about 17 feet wide north and south thereof at the east end, and which triangle was not on respondents' land. This strip of land is portrayed on Ptfs. Ex. D, copy of which is set forth herewith:

Appellants alleged and testified they did not know this until about February 20, 1952 when appellants promptly notified respondents of such situation and sought an adjustment, which was refused.

Appellants asked rescission, damages, return of the purchase money paid—the same to be declared a lien upon the land subject to the mortgage of the Prudential Life Insurance Company; that appellants be allowed to remain in possession of the land to secure such repayments, and tendered a quitclaim deed to the premises properly executed and acknowledged March 15, 1952.

The answer and cross-complaint denied any false representations had been made, sought a forfeiture of the contract on the asserted failure of appellants to pay the instalment due January 15, 1952, which by mutual agreement, had been extended to March 15 (Dfts. Ex. 3), demanded payment within twenty-four hours to prevent forfeiture, asked for restitution of, and decree quieting title in respondents to, the property described in the contract, and $2,000 damages for the loss of value and use and occupancy of the property.

Judgment and decree declared a forfeiture and gave respondents all payments made, the land, and $1,232.38 as the rental value from March 30 to December 1, 1952; declared a joint use of the ditch and pump between respondents and Owens; that the triangular piece of land belonged to Callister and Owens, and adjudicated an easement for a roadway, not involved herein.

At the time respondents purchased the land which later was contracted to appellants, one George Jensen (no relation to

respondents) owned the land immediately south of the East forty described above and he commenced, but discontinued, the ditch subsequently completed in 1946 and now along the eastern part of the south line of respondents' East forty, and later sold the property to the Callisters, who in turn sold to Owens, now in possession.

By an agreement between respondents and George Jensen, the dyke and ditch were completed by respondents with dirt taken from their land, the center of the ditch being practically on the south line of respondents' land or the northern line of the land owned by Callisters and Owens and the fence was constructed along the south toe of the ditch and dyke.

Respondents contended that full and complete adjudication could not be made without bringing in Callisters and Owens; they were accordingly brought in and by appropriate pleadings, respondents plead and contended they had purchased this triangular strip of land from George Jensen and likewise that they had openly, notoriously and adversely held and used it for more than five years prior to the instant suit. Callisters and Owens denied this and by proper pleadings asserted they owned the disputed land.

It is conceded that Owens, as successor of Callisters and Jensen and through interpurchase of pipe and contribution to construction costs and the price of the pump and pipe by each successive party, had with respondents the joint right to use the pump, pipe and ditch and to alternately carry water therein.

The court specifically found against respondents as to the ownership of this triangular strip of land, thus concluding:

## "VII

"That the defendants and cross-complainants Rulon J. Callister and Margaret Callister, his wife, and their successors in interest, John Lincoln Owens and Elva Owens, his wife, are entitled to a Decree of this Court quieting their title in and to the lands described in Findings of Fact Number XXVI, and to the triangular strip of land mentioned and described in Findings of Fact Number XXIV; subject, however, to the perpetual and irrevocable easement in favor of defendants and cross-complainants Victor Jensen and Alverda R. Jensen and their successors in interest in and to the use and enjoyment of a dyke or fill and ditch erected thereon, running in a westerly direction from the west bank of the East Branch of the Weggland Lateral a distance of approximately 300 feet more or less, for one equal half of the time represented by the irrigation season of each year hereafter, with right of ingress and egress for the use and enjoyment thereof and the maintenance and repairs necessarily incidental thereto or in the operation of said pump and auxiliary equipment."

The land described in Findings of Fact No. XXIV is the ditch, dyke and triangular strip of land, thus described:

## "XXIV

" * * *, and that the parties thereupon, by mutual agreement, erected a fence running along the southerly boundary of the triangular tract of land described as follows:

"Beginning at the Northwest corner of the Southwest quarter of the Northwest quarter of Section Nine, Township Two South, Range Thirty-five, East Boise Meridian; thence East 1169 feet, more or less, to the west bank of the Weggland Lateral; thence south 17 feet, more or less, to a large cedar post; thence Northwesterly following said fence line to the point of beginning, containing 143/1000 acres; * * *."

The court further found that respondents and their agent Dale at no time made any false, misleading or fraudulent statements to the plaintiffs and cross-defendants concerning the said lands and premises mentioned and described in the contract and they did not represent to appellants that the angling fence above described was on the south line of the property mentioned and described in the contract.

The court also found that the construction of the fence (not its location as a boundary), the dyke or ditch thereon, the ownership of the pump (not the ownership of the triangular strip) and the right to the use of such ditch, pump, motor and other equipment, were fully and completely

explained to appellants, which appellants in effect admit.

Appellants' numerous assignments of error (all of which we need not and do not consider) sufficiently raise the questions involved, namely, whether or not it was represented to appellants, and they thereby understood, the land they were buying included this triangular strip, and that it was of such material importance to them that when they found it did not, they were entitled to rescission.

We are mindful of the strictures resting on appellants as vendees seeking rescission stated in Nelson v. Hoff, 70 Idaho 354, 218 P.2d 345.

We accept the finding that the land in the triangular strip did not belong to respondents, never had belonged to them and they had not purchased it from George Jensen, nor prescriptively occupied it, which is not appealed from. Nevertheless, as bearing on what respondents contended they owned, what they were selling and what appellants were led to believe and had a reasonable right to believe they were buying, it is pertinent to consider respondents' pleadings and evidence. Respondent Jensen, in connection with the controversy as to the ownership of this triangular strip in bringing the Callisters and Owens into the controversy, alleged in his affidavit:

"That by agreement between George A. Jensen and respondent Jensen, the latter constructed the dyke and ditch and was authorized to install the pump, etc., 'on George A. Jensen's land.'

"That George A. Jensen reserved the right to install an additional pump, etc., on the triangular strip of land involved;

"That it was mutually agreed and understood and considered the fence they constructed on the south side of this strip was the boundary between their respective lands;

"That ever since March 15, 1943 the fence has been mutually accepted and agreed between them;

"That Callister and Owens succeeded George A. Jensen and they all accepted and acquiesced in the location of the fence on the southerly portion of the strip of land involved as the boundary line fence."

Conceding these pleadings could be justified and harmonized with respondents' contention that they never represented they owned this land, but were seeking to establish their title as claimed, to enure to the benefit of appellants as their grantees under Section 55-605, I.C., the basis of such concession would necessarily be that respondents claimed this strip and hence were selling it to appellants, which is exactly what respondent Jensen testified as later appears herein. Furthermore, respondent Jensen knew the eastern part of the fence was not on the true quarter section line; that it angled east, south of the ditch and

dyke. His claim to the strip was by alleged purchase from George Jensen, which the court found never took place, and adverse possession, not proved.

Respondent Jensen testified as follows:

"A. Mr. Brooks asked me how the water was conveyed to the west eighty of my property, and I proceeded to show him just by motion of the hand where the ditch come in, down through Gordon's field, past his house and barns, out back of the field a ways; then I showed him where our head gates were located, where the water came from there over into my field, and then it was divided into different ditches to go irrigate my farm. And then he asked me how the east forty of the farm was irrigated, and we had to step back out of the way, back out into the road a ways, back away from the machines so we could see up eastward, and I told him that east part was irrigated from the pump, and which was in operation at that time.

"Q. He saw you irrigating the east portion with the pump at that time? A. It was in operation at that time; yes.

"Q. Running? A. Yes, sir. Then he wanted to know about the fence lines, where was north, *and where was south,* and how far east it went, and so forth. (emphasis ours) I showed him up north, I says, 'That big potato cellar up there, which is Wakamatsu's potato

cellar,' I says, 'that isn't included in my farm.' 'Right across the road from there,' I says, 'There is a little piece of property in there that belongs to Mr. Winkler. That isn't included in my farm.' Then I pointed west to him, to the end of the fence, and the lavas was the boundary on the north, and I says, 'over on the other side of the road, there is forty acres over there, or approximately forty acres that belongs to me, too.' At that time there was Day Gordon and one or two of the other boys walked up to us, and in the conversation, why, I introduced Mr. Brooks to them, and the conversation went on from there as to how were the crops?"

It is significant with regard to the above and also later testimony quoted, that respondent Jensen was verbose in describing the east, north and west boundaries, about which there was no question, but carefully avoided any indication as to the south boundary:

"Whenever the owner of property undertakes to point out to a prospective purchaser the boundaries of the property he expects to sell, his representations are matters of fact, and not of opinion. In indicating the boundaries, he must do so accurately, and his failure so to do will amount to a false representation, even though he acted under an honest mistake, without intent to deceive. (Cases)." Darnell v. Noel,

34 Wash.2d 428, 208 P.2d 1194 at page 1196.

Respondent Jensen, continuing:

"Q. Was there any representation made by you, or by Mr. Dale, to Mr. Brooks or anyone else at that time and place on the afternoon of August 29th, as to where the south line of the property that you owned and were offering for sale, was located? A. Not in my presence; no.

"Q. Did you ever at any time tell him that the pump and the dyke and the pipe line, and motor, and cement pit were on the land, that is, the legal description of the land as set forth in the contract of sale which you later signed with him? A. I don't remember that that was ever discussed.

"Q. Don't you know? A. No, sir; it was not.

\* \* \* \* \* \*

"Q. Was there anything said about the fill? A. Well, that includes the ·pump and the fill and all of it.

"Q. What was said about the ·fill? A. Well, it was used jointly, fifty-fifty, with a·neighbor. Mr. Rulon Callister owned the property at the time. I told him I had put in the fill and put in the pump and that, and that Mr. Callister purchased a one-half interest in it.

"Q. In what? A. . In the pump and motor and fill and pipe, whate*r* there

was included there. Q. And the use of the,—

"Q. And the use of the water one-half of the time in operation."

In the latter quoted testimony, he said the matter of the south boundary was not discussed, whereas in the first quoted portion, he indicated appellant wanted to know where the south boundary was.

"Q. We are not up to the year 1944, Mr. Jensen. We haven't finished with the construction of that fence yet in 1943, if I recall what you say correctly. You say the fence was constructed east and then veered in a southerly direction to the west,—to the Wegge-land lateral; is that right? A. In 1943 when we constructed this fence, when we come to this point where this here fill had been started, he says, 'We will keep the fence on this side of the fill, so the ditch will be on your property and you won't have to keep coming through the fence to my property.'

\* \* \* \* \* \*

"Q. Was there any representation made at that time, or at any time prior to September 10th, regarding the location of the south line of the real property according to the legal description in that contract that you had already signed? A. No, sir; I can't remember that there was any discussion—any l*ai*nes on September 10th.

\* \* \* \* ·\* \*

"Q. Mr. Jensen, as I understand your testimony here, when Mr. Callister was referring to this pleading, you claim that at all times since this fence was put on the south side of this fill in 1943 that you have at all times since then claimed the land north of that fence? A. Yes, sir.

"Q. And have treated it as your land? A. Yes, sir.

"Q. And when you made this contract with Mr. Brooks you intended to sell to him everything,—all the land and right you had out there? A. Yes, sir.

"Q. You intended at that time to sell him the land on which the fill was located? A. All of the land lying north of the fence.

"Q. And that is what you intended to sell him? A. Yes, sir.

"Q. Now, it is a fact, however, Mr. Jensen that you never did get a deed to that land? A. Yes, sir.

*    *    *    *    *    *

"Q. He (Callister) owned the land on which the fill was located? A. No; he did not."

Respondent Jensen thus with complete, inconsistent, insouciance straddled the ditch and the fence.

"Q. And he (appellant Brooks) was inquiring about the place, about the ditches? A. Yes, sir.

"Q. And made inquiry about where the fences ran? A. Not definitely; no.

"Q. You were pointing out to him, as I recall your testimony, about the fences? A. Different parts of land that come out, of the place.

"Q. And pointing out to him about the location of the ditches and things of that kind? A. Yes, sir.

*    *    *    *    *    *

"Q. Mr. Jensen, Mr. Kerr asked you something about the fill, and then he asked you if you had sold a half interest,—he didn't say what in,—to Mr. Rulon Callister in the fall of 1946,—sometime during the year 1946, and I believe you answered yes, that you had sold a half interest in something to Mr. Rulon Callister. Now, will you explain just exactly just what dealings were had with Mr. Rulon Callister during the year 1946? What did you sell to Mr. Rulon Callister, if anything? A. I sold him a half interest in the pump, the pit, all the electric installations, and the pipe from the pump up to the top of the fill.

"Q. Did you sell,—did you discuss the sale of the dyke, or levy, to Mr. Callister, or the ditch on top of that dyke?

*    *    *    *    *    *

"A. I couldn't sell something to him that already belonged to him; no. Q. Did you, or did you not, Mr. Jensen? A. No, sir.

"Q. No, what? A. I did not sell him any interest.

"Q. In what? A. In the fill."

Dale, the admitted agent for respondents in the sale of the land is a licensed real estate broker and, therefore, subject to the provisions of Chapter 75, Sections 20 and 21, 1951 Session Laws, p. 117, at pp. 125 and 126, thus testified:

"A. Well, I don't believe there was ever any discussion about the lines. It was taken for granted that the fence was in place and that was the boundary.

"Q. Do you recall any reference being made to the south fence on the east forty? A. Nothing more than just it was the boundary line fence.

"Q. It was pointed out to you as the boundary line fence? A. Yes, sir.

\* \* \* \* \* \*

"A. I believe that I called attention to the fact that that was the south fence, or the boundary line of the forty we were in.

\* \* \* \* \* \*

"Q. And Mr. Jensen took you over the place? A. Well, I definitely remember that he explained the use of the pump to me that day and showed me the lines.

"Q. Well, he made no representation to you about the ownership of the, —I will withdraw that question. He did tell you, did he not, that the pump was owned jointly on a fifty-fifty basis with a neighbor? A. Yes, sir."

The ownership of the strip of land was thus dropped like a hot potato.

"Q. You had never been told by Mr. Jensen, or by him authorized to tell anybody else, where the south quarter section line, the legal description of the land that was being sold, would run with respect to this fill and ditch? A. I don't believe that there ever was a discussion about whose land it was on. I don't believe it was ever mentioned to me by Mr. Jensen, and I don't believe it was ever mentioned at any other time until Mr. Brooks commented at that time.

"Q. There was a fence between,— A. There was a fence between the two pieces of property; yes.

"Q. And as to whether that fence was on a survey line according to the description of their parcels of land, you never made any statement as to that? A. No, sir.

"Q. And you made no inquiry of Mr. Jensen about that, did you? A. No, sir."

Yet he had testified Jensen showed him the lines.

"Q. Was there anything said about this fence line running east from this corner to the Weggeland lateral (indicating)? A. I believe I said that that was the south line.

\* \* \*. \* \* \*

"Q. Did Mr. Brooks make a close examination of that fill? A. I don't believe it was too thorough.

"Q. Well,— A. I think he observed it. He was just looking for a farm, and usually a person don't go into those details until you get a definite interest in it, so likely that was passed up until later.

"Q. Did he get out of the car? A. Yes, sir.

"Q. At that point, I mean? A. Yes, sir.

"Q. Did Mrs. Brooks get out? A. I don't believe so.

"Q. Did you notice that the fence extended down in an easterly direction to this lateral? A. Yes, sir.

"Q. And on which side of this dyke, or fill, or levy, does the fence run? A. Well, after you get up to the levy the fence disappears. It is higher than the fence.

"Q. You mean you can't see the whole fence? A. You can't see a fence after you get past the levy.

\* \* \* \* \* \*

"Q. Now, Mr. Dale, did you at any time on August 29th, 1951, or at any time either prior or subsequent to that date state to Mr. and Mrs. Brooks, or anyone else, that that fence running east from the southeast corner of that forty acre tract on the east side of the road was on the south boundary of the land which was described in the contract to purchase, or did you represent it was on the south quarter section line? A. No, only inasmuch as it enclosed the east forty.

"Q. But you didn't represent it to be on the south line of the described land, meaning the land,—the legal description of the land as set forth in that contract? A. Well, I would hate to be so specific on any of those things.

"Q. I don't care what you would hate to be. I just asked you, Did you make such a representation at any time or at any place to Mr. and Mrs. Brooks, or anyone else? A. Not to my knowledge.

"Q. And do you know whether it is on the boundary line of the land decribed in this contract which Judge Anderson wrote up? A. I wouldn't be in a position to make an absolute statement like that.

"Q. Now, did you on the afternoon of August 29th at the Jensen ranch when you were with Mr. and Mrs. Brooks driving over that east forty,

did you represent to them, or either of them, or to any other person at any time or place, that this concrete pit lying north of the fence and that fill and levy with the ditch on top running west for some distance, on the north side of the fence, that ran west up to the county road, that pipe line from the ditch, and a flume extending on east to another fill, from the Weggeland lateral, or that ditch running north and south, did you represent to them, or to anyone else, that those improvement— were on the land covered by the legal description in the contract? A. I did not."

His attempted and completely unsatisfactory reconciliation of his vacillating testimony was thus given:

"Q. I will ask you then, Mr. Dale, —we might clear this matter up,— if in your previous testimony here in this Court you didn't testify in substance and effect that it was necessary to know the property lines and that you and Mr. Jensen went out and looked at the property, and that this fence along the south part of this east forty was pointed out as the boundary line fence? A. Yes, sir.

"Q. And if you further didn't testify in your previous testimony that you went to the lower end of the property first, around the house,—that would be the west end, when you were asked whether it was the east or west end, and you did so testify? A. Yes, sir.

"Q. And that then thereafter you went to the east end? A. If you say I did, in my former testimony.

"Q. And drove through that forty, and that Mr. Brooks examined the pump? A. Yes, sir.

"Q. And had some questions then about the pump? A. Yes, sir.

"Q. And you went back to the house and referred him to Mr. Jensen? A. Yes, sir.

\* \* \* \* \* \*

"Q. Now, that was your best recollection of this matter on the day you first testified? A. Yes, sir.

"Q. And that was also your best recollection of the matter on the day you talked to me in my office in March of 1951; is that correct? A. Apparently. He has all the records.

"Q. That was March, 1952,—excuse me. I made it the wrong year. And that on both of those occasions both in testifying here, and at my office, you said that you called attention to the fact that this fence, the south fence, was the boundary line. Your recollection on those two occasions then would be correct, would it not? A. Presumably. \* .\* \*

"A. Yes, sir.

214

A mild characterization, but a correct estimate of Dale's testimony is this apt statement:

"It may be added that it is not an unfair inference from Walker's testimony that such representation was made, although he manifestly was a witness rather hostile to plaintiff. Of course, he was naturally anxious to shield himself, and he appears to have been somewhat disingenuous; but a careful consideration of his whole testimony strengthens the conviction that he represented to plaintiff that the spring was a part of the property to be conveyed." Peardon v. Markley, 50 Cal.App. 257, 195 P. 70, at page 73.

George Jensen testified thus:

"Q. Now, Mr. Jensen, didn't he (Callister) tell you why they wanted you here? A. He told me he wanted me on this case, and the conversation I had with you last fall in your office; that Victor Jensen had still said the ground belonged to him, and he wanted me to come down and testify to the truth."

Respondents, January 30, 1950, mortgaged the pump and pipe on this triangular strip used in connection with the ditch and dyke thereon, to the Prudential Life Insurance Company of America, stating therein as follows:

" * * * all of which items of personal property are now installed on property *owned* (emphasis supplied) by the mortgagors, located on the N½ of the NE¼ of Section 8 or the NW¼ of Section 9, Township 2 South, Range 35 E.B.M., in Bingham County, Idaho."

This mortgage was filed in the book of Chattel Mortgages of the records of Bingham County and was in the abstract of title shown appellants.

Mr. Johnson, agent for the Insurance Company, who negotiated this chattel mortgage, testified:

"Q. Now, at the time you went out and looked at this property you say you saw this pump and the ditch and irrigation works; is that correct? A. That is absolutely correct.

"Q. And you had some conversation with Mr. Jensen about their location with reference to the property he was mortgaging to the Prudential Life Insurance Company of America? A. Well, whenever we make a loan, Mr. Kerr, the appraiser makes a plat of that entire farm. He shows the ditches and all the fences, and the roadways, and that is out of my category.

"Q. I wonder if you had any conversation, or were present at any conversation in which the location of those were discussed? A. I was present at that particular time.

"Q. And what did Mr. Jensen say with reference to the location of it,— whose land those things were on? A.

He pointed out they were on his own land. We checked the legal description to determine whether or not there was any encroachment of any other property on his premises.

"Q. And then from your observation, and from what you could determine from your observation at that time, those improvements appeared to be on Mr. Jensen's land? A. That is correct."

Respondent Jensen equivocated as to telling appellants where the south line of the property was, consistently contending, however, that since at least 1946 he had owned the triangular strip and intended to sell it to appellants; that in the chattel mortgage he asserted he owned this triangular strip. Dale, respondents' agent, contradicted himself and was evasive, but several times grudgingly admitted that he indicated to appellants the fence was the south line.

Respondent Jensen's constant repetition of the agreement as to the use of the ditch, but complete silence as to the ownership of the land on which the ditch was built, was deceptive and misleading and distinguishes this situation from Coolin v. Anderson, 26 Idaho 47, 140 P. 969. Nothing was told appellants of any possible controversy as to the ownership of the strip.

We may accept the learned trial court's finding that no *false* representation was intended, but the statement *no* representation was made by respondents to appellants that the fence was the south line is not sustained, but is contrary to respondents' evidence.

If Jensen told Brooks the land north of the fence was not his, it was contrary to his pleadings, his continuous contentions, his chattel mortgage and, according to Dale, what lines respondent Jensen showed him. If Jensen and Dale said nothing, they left it for Brooks to conclude from the fence that the land north of it was in the East forty Jensen was selling and the fence itself was an indication and representation of the boundary line. Rippey v. Harrison, 66 Wash. 109, 119 P. 178.

"The entire tract was occupied by appellants, and used by them as a home. The large house and other buildings were built upon the real property and the surrounding grounds had been developed by the planting of shrubs and trees, and was used as any ordinary home would be used. The property so maintained by appellants was in itself a representation that it was all owned by them. Its occupancy plainly marked its boundaries. We cannot imagine a more definite representation that the whole property, as occupied by appellants, was sold to respondents." Darnell v. Noel, 34 Wash.2d 428, 208 P.2d 1194, at page 1197.

The only justifiable conclusion from the above detailed facts and circumstances,

which arc all there are bearing on this phase, is that appellants were led to believe the pump, ditch and dyke were on the land being purchased. Respondent Jensen's own statement was that he intended, in selling the land to appellants, to include this triangular strip, which indicates he was either bona fide selling the strip as part of his land or undertaking to sell that which the court found he never owned and which, therefore, appellants never received. In either event, appellants did not receive what respondents at least mistakenly, if not intentionally, contracted to sell them.

"Where one makes representations as to the boundary lines of property which he owns and is selling, and such statements are in fact false, and the boundary pointed out by him is not the true boundary and the vendee, relying on such false statements suffers a loss by reason thereof, the right of the vendee to recover damages is universally recognized.

"If the defendant did not know where the true boundary of the land in question was, he should not have taken upon himself to point out the same, and to make a definite and positive representation concerning it and which the state of knowledge did not enable him to make with verity and correctness.

\* \* \* \* \* \*

"False representations of a vendor as to the quantity of a tract of land which he offers for sale are not mere matters of opinion but are material and he cannot avoid their consequences merely because the vendee might have ascertained their falsity by a survey of the land or by reference to official plats and records.

"Even honesty in making a mistake is no defense as it is incumbent upon the vendor to know the facts. (Cases)." Lanning v. Sprague, 71 Idaho 138 at page 143, 227 P.2d 347, 349.

Appellants, therefore, are entitled to a rescission of the contract. Taber v. Piedmont Heights Bldg. Co., 25 Cal.App. 222, 143 P. 319; Jackman v. Northwest Trust Co., 87 Or. 209, 170 P. 304; Mosher v. Lack, 41 Cal.App. 23, 181 P. 813; Lou v. Bethany Lutheran Church of Seattle, 168 Wash. 595, 13 P.2d 20; Vendor and Purchaser, 66 C.J. 562, § 112.

Suggestions to further enquire may be so made as to allay, not excite, suspicion and thus not be the basis for failure to further investigate. Of such nature were respondent Jensen's statements to "see Owens" and such statements were as to the *use* of the ditch, not its ownership. Dale testified he told appellants at the last conference it wasn't necessary to see Owens.

"The seller's misrepresentation as to the position of the boundary lines of the property may invalidate the sale

where the falsely asserted boundaries form part of the inducement to buy and constitute a material factor in the sale, as where land which would have formed part of the parcel conveyed, had the representations been true, is not included in the boundaries of the land actually sold and the part thus lost is a material part of the whole tract in quantity or in value. * * *" Vendor and Purchaser, 66 C.J. 588, § 139.

"As a general rule the owner of real estate in the absence of facts showing the contrary, is presumed to know the boundaries and area of his land, and a buyer is warranted in relying on his representations with respect to such facts; * * *." Vendor and Purchaser, 66 C.J. 610, § 161;

Dohrman v. J. B. Roof, Inc., 108 Cal.App. 456, 291 P. 879.

■ While the strip of land is small in area, considering the contour of the land; unavailability of dirt due to close, underlying rock; the essential use of the ditch and dyke in carrying water from the Weggland Lateral for the irrigation of the East forty, and appellants' expressed desire to enlarge and extend this ditch—hampered at least by not owning it—to irrigate the West eighty and thus supplant a circuitous ditch south and through another neighbor's land, and that they would not have bought if they had known the ditch and dyke were not on the land purchased, made the strip

of sufficient importance to justify rescission. Harder v. Lang Realty Co., 61 Cal.App. 394, 214 P. 1017; Stokes v. Johnson, 57 N.Y. 673; Keating v. Price, 58 Md. 532.

■ Appellants remaining in possession of the land, since they offered to give it back, tendered a quitclaim deed and desired it only for the purpose of protecting repayment of the instalment payments, and the improvements they had placed upon the land, did not deprive them of the right of rescission. Section 45–804, I.C.; Wilson v. Sunnyside Orchard Co., 33 Idaho 501, 196 P. 302; Jeffreys v. Weekly, 81 Or. 140, 158 P. 522; Kent v. Clark, Cal.Sup., 122 P.2d 521 and 20 Cal.2d 779, 128 P.2d 868, 142 A.L.R. 576.

■ Dale testified the fence could not be seen readily, because it was obscured by the dyke. There was other testimony that at the time the sale was consummated in September and when Brooks looked over the land, the weeds and grass and other growth were high and to some extent obscured a clear view of the ditch and dyke and the course of the fence. In other words, it was not clearly or immediately apparent from where Brooks stood near the house when the fence was pointed out to him, that it was not in a continuously straight line along the south boundary of the Forty in question.

The lapse of time between the date of the contract or the date appellants took possession, to February when they claimed they

first discovered the defect and immediately notified respondents, did not constitute such laches on their part as to prohibit rescission. Williams v. Marshall, Cal., 223 P.2d 644 and 37 Cal.2d 445, 235 P.2d 372; Darnell v. Noel, 34 Wash.2d 428, 208 P.2d at page 1198, supra; Lombardi v. Sinanides, 71 Cal. App. 272, 235 P. 455.

The parties stipulated April 30, 1952 appellants should remain in possession and farm the premises, by putting up $2,000 as security for payment for use and occupancy if respondents prevailed, and out of which was taken the $1,232.38 so awarded respondents.

■ Timely rescission being sought and respondents being at fault, the nonpayment of the March 15, 1952 instalment does not bar rescission. Gamble v. Beahm, 198 Or. 537, 257 P.2d 882.

■ Conceding, without deciding, appellants might in rescission be entitled to damages in addition to return of payments and value of improvements, Houchin v. Braham Invest. Co., 202 Minn. 540, 279 N.W. 370, 120 A.L.R. 1154; see also Stewart v. Salisbury Realty & Ins. Co., 159 N.C. 230, 74 S.E. 736, and Vicker v. O'Connor, 218 Wis. 216, 260 N.W. 426; appellants' expenses for trips from and loss in the sale of their property in Montana, though necessary to secure funds to make the purchase herein, are too remote and were not sufficiently within the contemplation of the parties to be recoverable. 25 C.J.S., Damages, §§ 24, 25, pp. 481, 488; 15 Am.Jur. 451, § 52 and 471, § 66.

■ There is no proper or sufficient evidence in the record as to the rental value of the land. Miles v. Johanson, 40 Idaho 782, 238 P. 291. Fleming v. Bithell, 56 Idaho 261, 52 P.2d 1099, did not overrule Miles v. Johanson, supra, as to what rental value is. Appellants, being entitled to rescission, are entitled to recover the payments on the contract and mortgage, taxes paid, and water assessments, cf. 66 C.J. 842, § 511; 51 C.J.S. Landlord and Tenant, § 365, p. 1069; Blake v. Metropolitan Chain Stores, 247 Mich. 73, 225 N.W. 587, 63 A.L.R. 1391, and Miller v. Buck Creek Oil Co., 38 Wyo. 505, 269 P. 43, 73 A.L.R. 824; and the value of the improvements they made, less the reasonable rental value of the land. Richards v. Jarvis, 41 Idaho 237 at page 249, 238 P. 887; McMahon v. Cooper, 70 Idaho 139, 212 P.2d 657.

The judgment and decree are, therefore, reversed and the cause remanded for the purpose of taking evidence as to reasonable rental value of the land and adjudication in accordance herewith.

Costs to appellants.

PORTER, C. J., and TAYLOR, THOMAS and KEETON, JJ., concur.