778 P.2d 340

**Donald L. POWELL and Muriel J. Powell, Plaintiffs–Respondents,**

v.

**James A. NIETMANN and Mary J. Nietmann, husband and wife, Defendants–Cross Claimants–Respondents,**

and

**Dave Reynolds and Jerry Van Ooyen, d/b/a Sommerfeld Realty, Defendants–Cross Defendants–Appellants.**

**No. 17549.**

Supreme Court of Idaho.

Aug. 9, 1989.

Gary A. Finney, Sandpoint, for appellants, Dave Reynolds and Jerry Van Ooyen.

James H. Paulsen, Sandpoint, for defendants-cross claimants-respondents, Nietmanns.

Nicholas M. Lamanna, of Priest River, Idaho, attorney for plaintiffs-respondents, Powells.

JOHNSON, Justice.

This appeal concerns a judgment of indemnity granted to the Nietmanns against Reynolds and Van Ooyen (Reynolds). The Nietmanns employed Reynolds, a realtor, to act as their agent to sell real property (the property) located on Lake Pend Oreille. The property was sold to the Powells based on representations by Reynolds that a subsurface septic disposal system could be installed on the property to provide sewage disposal. Rescission was granted to the Powells because no known subsurface, lagoon or mound sewage disposal system could be placed on the property. As part of the rescission, the Nietmanns were required to pay the Powells (1) the amounts that the Powells had paid pursuant to the sale agreement, (2) interest on these amounts, (3) other amounts expended by the Nietmanns while they were in possession of the property and (4) the attorney fees incurred by the Powells in prosecuting the action for rescission. The trial court granted the Nietmanns a judgment against

Reynolds indemnifying the Nietmanns for all amounts they were required to pay to the Powells. We conclude that the Nietmanns were entitled to recover from Reynolds the amount of the commission paid to Reynolds, and to be indemnified by Reynolds for (1) the fees paid by the Powells for architectural plans and for site inspection by an engineer and (2) the costs and attorney fees awarded to the Powells against the Nietmanns. We vacate the judgment and remand the case to the trial court for a new judgment in these amounts.

## I.

### THE BACKGROUND AND PRIOR PROCEEDINGS.

In 1978 the Nietmanns purchased a tract of land on Lake Pend Oreille. They intended to subdivide the land, keeping one lot for themselves and selling the others. In July 1978, the Nietmanns submitted a subdivision plan for seven lots with sewage disposal to be provided by a septic sewage disposal system. In August 1978, this plan was disapproved because the soil conditions "were not suitable for sewage." In early November 1978, the local health district notified the Nietmanns that it would not approve a conventional septic tank drain field system for the subdivision, but that it "could possibly approve an adequate engineer designed waste disposal system for two home sites, possibly three." In late November 1978, a revised subdivision application limiting the subdivision to three lots was considered by the local planning and zoning commission. The planning and zoning commission found that sewage disposal in the subdivision would necessitate "a specially designed system approved by the State" and recommended to the county commission that the subdivision be granted. The subdivision plat was not approved and recorded until May 1980.

In early 1979 the Nietmanns decided to sell two of the lots, one of which was the property at issue here. They employed Reynolds to act as their sales agent. The trial court found that the sewage disposal problems were not discussed between the Nietmanns and Reynolds at the time the Nietmanns gave Reynolds a listing to sell the lots or at any time prior to the sale of the property that is at issue here.

In the late summer and fall of 1979, the Powells were looking for land upon which to build a year-round residence. They became aware that the property was for sale and contacted Reynolds. The Powells informed Reynolds that they wanted a place suitable for construction of a year-round residence and asked Reynolds if he knew of any problems in that connection that they might encounter on the property. Reynolds said he did not. Reynolds told the Powells not to worry about a septic sewage disposal system, since everyone in the area had one and that one could easily be installed by a local contractor. The Powells asked that a provision concerning the availability of a septic system be included in the agreement for the purchase of the property. Reynolds stated it was not necessary and that he would send them documents to prove that a septic tank system would be approved. Following these assurances, the Powells signed the agreement for the purchase of the property on August 30, 1979. The Nietmanns signed the agreement on September 7, 1979.

On September 4, 1979, Reynolds sent a letter to the Powells stating that he was enclosing "the sub-division report of the lake property showing that it was approved by the county commissioners and the Health Dept. after it was reduced from seven to three parcels." The enclosures indicated that the local health district had "approved a sewer system" for the subdivision and that sewage disposal would "necessitate a specially designed system approved by the State." The trial court found that it could not be determined whether or not the Powells received the letter from Reynolds dated September 4, 1979, before the Nietmanns signed the agreement on September 7, 1979. The sale was closed in December 1979.

During the winter of 1980, the Powells employed an architect to prepare plans for a year-round residence on the property. In the spring of 1980, the Powells tried to obtain a sewage disposal permit from the

health district. The health district informed the Powells that it would not approve any type of sewage disposal system on the property. After that the Powells used the property approximately one weekend per month throughout the summer months by placing a camp trailer there.

During the summer of 1980, various attempts were made to find a solution to the sewage disposal problem on the property. When these attempts failed, the Powells sent a letter to Reynolds dated December 10, 1980, and a letter to the Nietmanns dated January 15, 1981, both demanding rescission. Rescission was rejected by the Nietmanns on January 21, 1981. In 1981 the Powells sued the Nietmanns and Reynolds for rescission or for damages. The Powells continued to make payments on the property as required by the agreement until July 1983. The Nietmanns crossclaimed against Reynolds for indemnification as to any amounts they were required to pay the Powells and for the commission they had paid Reynolds. Before trial, the Powells elected to pursue only the claim for rescission.

Following a trial, the trial court granted rescission to the Powells based on the misrepresentation by Reynolds that the property was suitable for a year-round residence and that a subsurface septic disposal system could be installed on the property. The trial court found that in order to restore the Powells to the status quo they were entitled to judgment against the Nietmanns for the following amounts:

| | |
|---|---|
| Closing costs (including down payment and costs) | $14,480.00 |
| Payments on principal | 3,350.48 |
| Interest paid | 16,865.52 |
| Escrow fees | 73.00 |
| Architect's fees for house plans | 1,400.00 |
| Engineer site inspection for septic permit | 78.43 |
| Property taxes for 1981, 1982, 1983 and 1984 | 972.78 |
| Interest on down payment | 14,261.80 |
| Interest on monthly payments | 14,030.47 |
| Costs and attorney fees | 7,446.34 |
| Total | $72,958.82 |

The trial court also found that the representations made by Reynolds about the availability of a septic sewage disposal system on the property were not authorized by the Nietmanns and were not based upon statements or representations made by the Nietmanns to him. The trial court concluded that the Nietmanns were entitled to indemnification from Reynolds for the amount paid by the Nietmanns to the Powells because of the rescission.

## II.

## THE POWELLS ARE ENTITLED TO RESCISSION.

Reynolds asserts that the Powells were not entitled to rescission because they elected not to pursue that remedy by continuing to use the property and to make payments. We disagree.

We first clarify that the Powells are not properly respondents in this appeal. The judgment in favor of the Powells against the Nietmanns is not on appeal here. However, that does not prevent Reynolds from raising as between himself and the Nietmanns the issue of whether the Powells were entitled to rescission. While a determination of this question could not affect the judgment of the Powells against the Nietmanns, it could affect any liability that Reynolds might have to the Nietmanns by way of indemnification.

■ There is no indication in the record that the defense of the action for rescission against the Nietmanns by the Powells was tendered to Reynolds. Only if Reynolds had been asked to defend the Nietmanns and had refused to do so would the judgment of the Powells against the Nietmanns be conclusive against him to establish the measure of his liability to indemnify the Nietmanns. *International Harvester Co. v. TRW, Inc.*, 107 Idaho 1123, 1125, 695 P.2d 1262, 1264 (1985). Since the Nietmanns did not tender the defense to Reynolds, the judgment against the Nietmanns is not conclusive against Reynolds.

■ Even though the judgment for rescission is not conclusive against Reynolds, the "election of remedies" issue he raises as to the right of the Powells to rescind is fallacious. Our Court of Appeals disposed

of the election of remedies doctrine in *Keesee v. Fetzek*, 106 Idaho 507, 681 P.2d 600 (1984), *rev. den.* There, the Court of Appeals concluded:

> If a plaintiff is said to have "elected" a remedy through certain acts or statements prior to litigation, the proper inquiry should be whether the defendant has relied upon such acts or statements and, therefore, would be unfairly prejudiced by assertion of a different, inconsistent remedy. · If so, the plaintiff should be bound to the remedy earlier chosen, not because of the election doctrine but because of the estoppel principle. Absent estoppel, he should be free to choose a different remedy.

*Id.* at 510–11, 681 P.2d at 603–04.

We find no basis for estopping the Powells from pursuing rescission here. There is no showing of any unfair prejudice that the Nietmanns suffered because the Powells used the property occasionally and continued to make the payments until 1983.

## III.

## THE NIETMANNS ARE ENTITLED TO INDEMNIFICATION.

■ Reynolds asserts that the Nietmanns are not entitled to indemnification because the Nietmanns were themselves guilty of misrepresentation by proceeding with the sale of the property, even though they knew that they could not obtain approval from the health district of a sewage system for the property. We disagree.

The trial court found that the Nietmanns did not discuss sewage disposal with Reynolds prior to the sale of the property to the Powells. The trial court also found that Reynolds told the Powells before they signed the agreement to purchase the property that he had checked out whether a septic system could be used on the property and that a "normal system" could be used. In fact, these statements by Reynolds were not true. The Nietmanns had no contact with the Powells before the sale. Therefore, any misrepresentations were those of Reynolds. It was those misrepresentations that were the basis for the rescission. The Nietmanns were entitled to indemnification from their agent, Reynolds. *May Trucking Co. v. International Harvester Co.*, 97 Idaho 319, 321, 543 P.2d 1159, 1161 (1975).

## IV.

## THE NIETMANNS ARE NOT ENTITLED TO INDEMNIFICATION FOR AMOUNTS WHICH BENEFITED THEM.

■ Even though the Nietmanns are entitled to indemnification, they are not entitled to indemnification for all the amounts they are required to pay to the Powells as a consequence of the rescission. Some of these amounts represent payments that were made by the Powells to the Nietmanns or for their benefit. The closing costs (including the down payment and costs), the payments on principal and interest and the property taxes are of this nature. Also, the interest awarded for the amount of the down payment and the monthly payments compensates the Powells for the loss of the use of their money until the rescission was ordered. The Nietmanns, not Reynolds, had the use of this money until the rescission was ordered. It would not be equitable to require Reynolds to indemnify the Nietmanns for these amounts.

■ The Nietmanns are entitled to have restored to them the commission they paid to Reynolds ($4,950.00), plus interest on that amount from the date of its payment. They are also entitled to indemnification for the escrow fees, the architect's fees, the fees for the site inspection and the costs and attorney fees awarded to the Powells against the Nietmanns. The Nietmanns had no benefit from these amounts and would not have been required to pay these amounts but for the misrepresentations of Reynolds.

## V.

## CONCLUSION.

We vacate the judgment and remand the case to the trial court for judgment consistent with this opinion.

Because of the mixed result here, we award no costs or attorney fees on appeal.

BAKES, C.J., and HUNTLEY,* J., concur.

SHEPARD, J., sat, but did not participate in the opinion due to his untimely death.

BISTLINE, Justice, concurring and dissenting.

Generally I concur in all of what Justice Johnson has written, other than I do not feel that his opinion wholly rectifies all the error in the proceedings below, and fails to correct the injustice meted out to Reynolds.

Justice Johnson in Part III of his opinion has written, "The Nietmanns had no contact with the Powells before the sale. Therefore, any misrepresentations were those of Reynolds. It was those misrepresentations that were the basis for the rescission."

The trial court, Judge Prather, wrote otherwise in his decision: "The overall evidence shows that Nietmanns and Reynolds were aware of the falsity of their statements or should have known of the falsity thereof and made such representation in reckless disregard and without any effort to ascertain the truth thereof." R. p. 407.

It is axiomatic that the trial court, not this Court, is the finder of fact. From a reasonably close perusal of the entire appeal record, including the transcripts of testimony and the deposition testimony admitted as exhibits, and other exhibits, it is apparent that Judge Prather held Nietmann responsible not so much for what he said, but what he knew and did not disclose to Reynolds when he listed the property for sale, namely, and as Judge Prather wrote:

> The officials of Panhandle Health District advised the Nietmanns that they knew of no type of sewage disposal system that could be approved for the subject property because of the extremely poor drainage conditions of the soil. The Panhandle Health District officials repeatedly stated that 'possibly an engi-

neered system could be approved'. By these statements the Panhandle Health District officials meant to convey that they had no knowledge of any system of sewage disposal that could be approved but that they would consider any plan or proposal submitted by an engineer to evaluate its suitability for approval.

Throughout the summer and fall of 1978 the Nietmanns did not ascertain or learn for certain what the terms 'engineered system' or 'specially designed' system. But, in any event, *it was made very clear to the Nietmanns that a conventional septic tank and subsurface drainfield disposal system would not be permitted upon the property.* This was directly brought home to the Nietmanns by a letter from Panhandle Health District dated November 2, 1978. See Plaintiff's Exhibit # 6.

That letter was equally explicit:

Mr. James A. Nietman

856 County Meadow Lane

St. Louis, MO 63141

Dear Mr. Nietman:

As stated in our conversation, this office could possibly approve an adequate engineer—designed waste disposal system for two home sites, possibly three, on your parcel of land located on the Hope Peninsula.

As I stated, the reason I cannot approve a conventional septic tank drainfield system in this area is because of the shallow soils before hitting rock or clay and the saturated ground water condition in the Spring.

> Sincerely,
>
> Bob Camp
>
> Panhandle Health District

Continuing with Judge Prather's decision:

> The Nietmanns decided in early 1979 to go ahead with sale of the subdivided lots. They thereupon contacted defendant Reynolds to act as their selling agent. According to the testimony of Nietmanns there was very little discussion between them and Reynolds concerning the property. That discussion centered upon the

---

* HUNTLEY, J., fully concurred prior to his resignation August 7, 1989.

price and terms for which the property would be sold. According to Nietmanns there was no discussion with Reynolds concerning the sewage system approval. *Defendants Nietmann did acknowledge that if defendant Reynolds told the plaintiffs what the plaintiffs claim that he did, such statements would have correctly represented what the Nietmanns thought and believed.*

This last sentence of Judge Prather's was based on this particular inquiry of Nietmann by counsel for Reynolds:

Q  Did Dave Reynolds on your behalf act to get approval of the Panhandle Health?

A  Not to my knowledge, no. They—none of that was ever mentioned in any conversation or correspondence, so that's all I can say.

Q  I'm just trying to get the sequence. In other words, the part that he came into play was for the sale of the lots from you?

A  That's correct.

Q  And his portion started *after you at least thought you already had Panhandle Health's approval?*

A  That's correct.

Q  I see.  Can you just recall what you told him about the approval you did have?

A  I didn't tell him anything.  Never—that point never came up.

. . . .

Q  To give you a little background, Powell says that Dave Reynolds misrepresented to him some things and he's sued Reynolds along with you. In other words, he says Reynolds misrepresented that Panhandle Health District had approved the subdivision. Now, do you make the same contention against Reynolds?

A  You know, there was just—I don't know what Dave either put in writing or said because he and I never had anything orally or in writing regarding this whole issue. I mean, it just never came up.

Q  Well, then, do you know of anything that Dave Reynolds misrepresented that would be on your behalf?

A  No, because as I say, it was such a cut-and-dry transaction.  I told Dave I was interested in selling, he said 'Fine. I've got some potential buyers.'  Then, he sent me, you know, the forms for first to let him be agent, and then later he let me know if he got a buyer, and, of course, we had talked about the terms. So, he said this is, you know, just what we agreed to, filled out all the forms by mail, and so, as I say, there was really no conversation or correspondence that dealt with anything else but just the normal papers, transactions to have a buyer and seller transact business.

Q  Do you make any contention that Dave Reynolds misrepresented you in the sale to Powell?

A  No, no.  We had agreed on what I felt with his advice would be a fair sale price and all the other terms, and he satisfied that, and the paper showed it, and just went ahead and transacted our business.  And so, I have no reason to believe he either misrepresented me or anyone else, but I say that only because there was nothing in our conversation or correspondence.

Q  Let's assume for a minute that Dave Reynolds would admit or say that he said: Yes, when I sold to Powell I represented or told Powell that Nietmann's had Panhandle Health's approval for this subdivision—

A  Yes.

Q  —for residential use.  In other words, Powell could buy and build a house on it.

A  Right.

Q  And we'll assume Reynolds said all that I've repeated—

A  Right.

Q  —and do you contend anything about that as misrepresenting you?

A  At the time I had—if Dave had said that, I would have felt that was just natural because people would maybe raise that question, and I wouldn't have questioned it. *I wouldn't have felt that it was misrepresentation.*

Q *All the facts that I recited, if Dave thought so, they are something you thought also?*

A I agreed—*I would have agreed with that.*

MR. FINNEY: Okay, that's all I have. Thank you.

Mr. Nietmann had first been examined by counsel representing the Panhandle Health District, named as a defendant in Nietmann's Third Party Complaint, which was filed along with Nietmann's answer to Powell's complaint, and Nietmann's cross-complaint against Reynolds.[1]

This following testimony is illuminating because it shows clearly that Mr. Nietmann, a college professor and administrator from St. Louis, Missouri, was simply out of his bailiwick in his negotiations seeking approval for his 3–lot subdivision:

Q Okay, you purchased this property with the intention of possibly subdividing it?

A Yes.

Q And how were your sons involved in this potential subdivision?

A Well, of course, legally they're not co-owners or anything. They simply live in the area, and they had purchased property in the area for their own personal reasons, and that's what brought my attention to the property in this area. And I felt with them here, why, it was going to be relatively easy then to take care of legal matters of getting approval for subdivision, and, in other words, they were really acting as my agents, although we didn't ever formalize this le-

---

1. The third party action against Panhandle was based on allegations that Panhandle *had* approved sewage disposal relative to the subject property, and that following Nietmann's sale to Powells Panhandle had a change of mind "to the financial detriment" of Nietmanns. The claim for relief was mandamus to compel Panhandle to give its approval, or, for indemnity if Nietmanns were held liable to Powells. In resisting Panhandle's motion for Summary Judgment, Nietmanns submitted a brief detailing their case theory. That brief supplies certain information which, though it is extremely pertinent, has not been discussed in either the written decision of Judge Prather or in Justice Johnson's opinion. A portion of it is as follows:

   The conduct of Mr. Camp as one of the few employees of the Panhandle Health District authorized to issue sewage disposal permits, was such that he concealed that there was no sewage disposal system which the District would allow. That is, through his letter dated November 2, 1978, James A. Nietmann deposition, Exhibit 9 and through his action at the November 30, 1978, meeting of the Bonner County Planning and Zoning Commission, *it appeared that the Panhandle Health District had approved a sewer system for Nietmanns' subdivision.* This letter, and the subsequent approval before the Commission was done when Mr. Camp harbored an unexpressed opinion that no sewer system could be utilized on Lot 9. This was surely tantamount to a false representation, or at least action which was calculated to convey an impression that facts were otherwise than those then openly asserted by the Panhandle Health District. It is clear that *Mr. Camp reasonably could anticipate that Nietmanns would rely on the action of the Panhandle Health District before the* Planning and Zoning Commission. *Nietmann did, in fact.* He pursued his subdivision and *sold lots as he had expressed his intention to do.* Mr. Camp had knowledge of the true position held by the Panhandle Health District that it was unaware of any sewage disposal system that it would approve. Nietmanns had no reason at that point to believe that Camp's expressed statements did not represent the true position held by the Panhandle Health District that it would approve a sewage disposal system. Nietmanns had no knowledge that the Panhandle Health District's position was any different than that set forth in Camp's letter of November 2, 1978, and the findings of the Planning and Zoning Commission and the County Commissioners as set forth in the minutes of November 3, 1978. See James A. Nietmann deposition, Exhibits 7 and 9. *Nietmanns relied on the conduct of the Panhandle Health District by selling two of their three lots, one of which sales resulted in this litigation.* Nietmanns have met their burden of establishing all the elements of estoppel as set forth in *Dalton Highway District v. Sowder.*

   Under the above circumstances, the doctrine of estoppel would be applied against the third party defendant even under *Harrell v. City of Lewiston,* 95 Idaho 243, 506 P.2d 470 [1973].

   Judge Prather, however, found *Harrell* applicable, and dismissed Nietmann's third party action against *Panhandle.* The Nietmanns are most assuredly responsible for and bound by the statements made in their brief; moreover, the testimony of *Nietmann* himself is the basis for those statements. Flying directly into the teeth of Mr. Camp's letter, but thinking he had approval when he did not, he retained Mr. Reynolds to find him a buyer.

gally. They were here, and they knew the people, they could keep track of what was going on in the area, and as I say, when it came time as it did to subdivide, they were the ones who went to the Planning Commission, *they sat in on the hearings, and also met with the Health Department.* Other than possibly one or two meetings with the Health Department, *I never met with any of the Planning Board or the Planning Commission, did not attend any of the hearings.*

Q Have you ever been involved in land development or subdivision previously on anything?

A No, I haven't.

Q This was your first involvement?

A Right.

. . . .

Q All right. Now, then, what was your personal involvement in getting the subdivision approved? What did you do personally?

A Nothing.

He testified to one visit to the Panhandle Health District in Sandpoint, Idaho, in the summer of 1978:

Q What was the purpose of that meeting, do you recall, with the Health District?

A As far as I know, we were trying to find out why, you know, we couldn't go ahead because my sons, apparently, had talked earlier—and I don't know the exact conversation, but there was something going on that it was not going to be just, I would call it, a cut and dry approval of a sewer or septic system. And they had communicated that to me, and so we went in together and had a conversation trying to clarify exactly what were the regulations, and what was going to—or what the difficulty was, why were we being told that either it was going to not be approved or that there was going to have to be more testing or that some special arrangements— we were discussing all these kind of things. As I recall—this I do recall very clearly—*we were trying to find a suitable way to solve the problem of the*

*sewer system, and obviously wanted to know what the regulations and what the alternatives were.* We tried to raise with the Health Department representatives, well, what are our alternatives. So, it was in that vein that we discussed it.

Q So, in the summer of 1978, then, would it be fair to say that you were aware that your subdivision proposal faced some difficulties with the Health officials? Would that be a fair statement?

A Well, we were still satisfied from the discussion that there was going to be a way of solving it, but we were finding that it wasn't going to be just, as I say, cut and dry. My recollection—I went away saying, and I think my sons—we all said, well, you know, it's just a matter of finding the right method.

Q What was your understanding of the specific problems with the Health District? Why—

A That's what was part of our problem as far as I was concerned. We just didn't get satisfactory help or cooperation. It was very vague, very uncertain as to why we were being told that there were questions. And we—as my sons reported, they went back more than once to try to clarify what was the difficulty because we had no inkling, *there was no reason to lead us to believe that there was any problem.*

Q Well, what type of sewage disposal system were you proposing for this subdivision?

A *Septic tank, the way that we understood that it was the usual way.*

Q And you had no idea why a septic tank was not acceptable on this property?

A No—you know, they were throwing around ideas, but we weren't given what I would call, you know, chapter and verse as to this is what you have to do. We kept saying: What is it that has to be done, what is it that is keeping the thing up?

Q Did you fill out any application at that time, any written applications with

the Health District for any type of approval?

A  No, because there wasn't any plan on our part to build at that time.

Q  But a residential subdivision was contemplated; would that be correct?

A  Yes.

Q  A year-round residential subdivision as opposed to—

A  I would say yes.  It wasn't clear in our minds at the time, but at least it was the idea that it would be a system that would service, and I would say was probably implied that it would be year-round.

Q  Do you have an understanding yourself of how a septic tank works, what it does?

A  I would say a layman's understanding.

Q  Would you explain that for us, what your understanding was at that time?

A  You have to have a drainage field, and you have to be able to pipe—you know, from the house into the field, and you have to—as I say, I don't know the details of whether you have a tank.  I know the place that we have in Colorado, we have a septic tank.  *I guess I was assuming that knowing that, that it would probably be a septic tank.*

Q  *Are you aware of how soil conditions and water tables may affect the operation of a septic tank?  Was that discussed with you or did you have knowledge?*

A  *I would say that wasn't discussed at all.*  I have, again, a general knowledge.  *I thought a tank could be put in the ground*—and this is what I thought—*and it really didn't matter what the soil was because the tank was going to receive the effluent,* and that whatever had to be done to put that effluent in a shape that would not cause · a health hazard.  So, my concept was that there was—*it was a simple thing. You dig a hole, put a tank in, and what was the difficulty?*  I remember I couldn't understand why the Health Department was—you know, not just saying: Yes, that's what you do.  So, *I*

*didn't think that the soil was so important,* but *I thought it was that you had to have the right size tank and that you had to have that treated or something happens inside the tank to make sure you don't have a health hazard.*  I understood, too, that, of course, you weren't supposed to have it leak, and so forth.  But again, *our St. Louis home is on a sewer line,* so I never—you know, *when we went to Colorado our builder there just said, well, we'd use a septic system and we'd have a tank.*

Q  This is lake-front, is it not, adjacent to the water?

A  It certainly is.

Q  *Have you ever owned lake-front property previously or built on it?*

A  *No.*

Q  Now, you indicated that there were some concepts discussed at the first meeting with the Health District officials, was the term engineered system or any type of special sewage disposal system—

A  I think they said it had to be built to specifications, and that—

Q  By an engineer?  Was that discussed?

A  It probably was.  I don't honestly recall.  *I would say that I understood that we couldn't personally put it in unless, again it was done according to specifications.  So, I think we understood that there would have to be a qualified company or firm that does this kind of thing to put it in.*

Q  *So, did you come away* from that meeting in the summer of 1978 *with the understanding that a basic ordinary septic tank as you were familiar with would not be acceptable for this site?*

A  *No, I certainly did not.*  I came away very uncertain as to where we stood or as to why we were not being given easy and immediate permission or at least understanding as to what it was going to take.  We never got, in my judgment, an explanation as to either what the options were.  We clearly said, 'Would you tell us?'  And the answer was—well, you know, it just wasn't satis-

fied. It was one of the most vague meetings I've ever had when I go to what I thought was a professional representative of a health department.

(Emphasis added.)

He was shown the letter of November 2, 1978, set out *supra*, and asked if he recalled the conversation with Mr. Bob Camp mentioned therein. His answer was, "I don't remember. I remember this letter, and I honestly don't remember whether he had other conversations with our sons, and—because when I left the second time, as far as I could see, it was still unclear as to what we were going to be able to do.

But he commented on his thoughts relative to the letter:

Yes, but still feeling very good that it was just problems of communication that somehow or other we could get on the same wave length, and that's about all I can recall now. And the understanding was, *my sons, you know, would continue to work with the Health Department to find the right answer.* I'm an individual who believes very strongly that reasonable people can find right answers. I was disappointed that when I left that we still hadn't found the answer, but I certainly felt that it was just a matter of time, and when I did get this letter I was disappointed that they said, 'two, possibly three,' but I felt—I interpreted this to mean that certainly there were two home sites that there was an answer to, and when he said possibly three, but I didn't recall this being said in any conversation with Bob Camp to me. It may have been said to my sons, but not to me.

He admitted that he never reached the stage of seeking an engineering proposal, but had taken measures to subdivide the property into three equal parcels, but was not aware that the final plat was not finally signed by everyone until May of 1980, which was after he had commenced selling two of the three lots.

Finally, *asked if at the time of listing he was "under the impression that some sort of sewage disposal could be installed on the property,"* he answered:

*Absolutely.* It's just a matter, as I said earlier, that we were going to continue to work with the Health Department, but *having had the approval* and all that, there was no doubt in my mind that it was just a matter of having to work with them and come up with the plan that they would tell us. I expected them to say: This is what you will do, but having had it approved I saw no problem at all.

Judge Prather concluded from his understanding of the testimony "that the sewage disposal problems were not discussed between Nietmanns and Reynolds at the time of listing or at any time prior to sale to the Powells." Justice Johnson has included that in Part III of his opinion: "The trial court found that Nietmanns did not discuss sewage disposal with Reynolds prior to the sale ... to the Powells." But this does not necessarily militate against the Reynolds' contention that he is not liable to indemnify Nietmann, which is opposite to the conclusion which Justice Johnson reaches in Part III of his opinion.

*Judge Prather* was the trier of fact, and as such he specifically noted in his opinion that: "The overall evidence shows that Nietmanns and Reynolds were aware of the falsity of their statements or should have known of the falsity thereof and made such representations in reckless disregard and without any effort to ascertain the truth thereof." R., p. 407. That culpability, as I have been careful to point out, arises from Nietmann's carelessness or indifference, and possibly lack of acumen, in prematurely listing the property for sale when it was not ready for sale. Although it is obvious from reading his testimony that he was confused when he did so, he is nonetheless responsible for setting into motion a chain of events which would culminate in Reynolds taking a listing from Nietmann and the resultant sale to Powells. But for Nietmann's seeking out Reynolds and listing the property for sale as a residential lake lot, this unfortunate transaction would not have taken place. Listing the lake property for sale was much like selling a new article of personalty to which there is attached an implied warranty of

merchantability. "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is ... an implied warranty that the goods shall be fit for such purpose." I.C. § 28–2–315.

Here, Powell's sole reason for rescinding was that the lot was not "buildable"—meaning that no one would knowingly buy a lot upon which to build a house which would not have a sewage system. Equally clear, initially it was Nietmanns' conduct alone which led to Reynolds' becoming involved, and Powell's purchase. It is both unfair and erroneous to make Reynolds liable to Nietmann for advising Powell that documentation was available which would show that a sewage system had been approved by Panhandle. That was *not* a misstatement.[2] There was such documentation, and it was produced and delivered to Powells. It is found in the Nietmann deposition as Deposition Exhibit # 7, and shows that on November 30, 1978, the Nietmann application was considered by Bonner County Planning and Zoning Commissions. Signed minutes of the meeting read as to the action taken: "This subdivision was heard in August of 1978 and was tabled due to soil conditions not suitable for sewage. The original Subdivision was 7 parcels. Mr. Nietmann has since cut it down to 3 *and Panhandle Health has approved a sewer system.*" (Emphasis supplied.)

It was only in another separate document, under a different date, December 8, 1978, where in a memorandum of the 30 November meeting which was sent to the Bonner County Commissions, that mention was made that "Sewage disposal will necessitate a specially designed system approved by the State." Nietmann Deposition Exhibit # 8.

When Reynolds transmitted this documentation to Powells, his letter accompanying it said only: "Enclosed is the subdivision report of the lake property showing that it was approved by the county commissioners and the Health Dept. after it was reduced from seven to three parcels." Reynolds could only have been acting as a conduit, doing so on behalf of Nietmann, his principle. It is clear that Reynolds had no involvement in Nietmann's dealings with Panhandle Health.

Notably, Reynolds said nothing whatever therein about the documents. Specifically his letter said nothing whatever about sewage, which according to Powell's testimony had been his main concern and the primary subject of their previous conversation. Judge Prather observed in his written decision that: "The critical information in Exhibit # 2(a) is the statement ... 'and Panhandle Health has approved a sewer system.' (This statement is in fact false as Panhandle Health had never approved any sewer system for the property.) The important language of Plaintiffs' Exhibit # 2(b) is the statement thereon, 'Sewage disposal will necessitate a specially designed system approved by the State.' "

While Judge Prather may be, and probably is, correct in stating that the statement about Panhandle Health's approval is false, that statement was not a statement made by Reynolds. Rather, the statement was that of the Bonner County Planning and Zoning Commission, a governmental entity. It would also have been a matter of record open to the public. Not only did Powell rely on that public document, as he had a right to do, but Reynolds, too, relied on it, as he had a right to do, in assuring Powell that the earnest money agreement need not contain a paragraph conditioning its efficacy on the obtaining of a sewage approval.

When *all* of the facts and circumstances of this case are brought out, and when *all*

---

2. The district judge at a post-trial hearing held one month after issuing his written decision commented:

THE COURT: I might add, Mr. Finney, there is one point of the whole case that I think perhaps that you and I could agree on, and that is, it is too bad Panhandle Health can't really be held accountable in this, because in my view their wishy-washiness in lack of clarity of language and speaking in their bureaucratic language which nobody understood is what brought all the rest of these litigants in here.

of the testimony is given consideration, it is not possible to reach an equitable conclusion that Reynolds should have been held liable to Nietmann for any losses or damages which Nietmann incurred by reason of the trial court's decision rescinding the transaction between Nietmann and Powell.

Where I cannot complacently agree with Justice Johnson's opinion is in his placing *all* fault on Reynolds because of Judge Prather's statement that "the sewage disposal problems were not discussed between Nietmanns and Reynolds at the time of the listing or at any time prior to sale to the Powells." Assuming, as we must because Judge Prather's statement is a finding of fact, that this is true, it is nevertheless wholly inescapable that Nietmann *should have disclosed* to the broker whom he was employing that the plat of his property had not been approved and that he had been advised in writing in no uncertain terms that Panhandle had not given its authorization to any sewage system for the lot Nietmann was placing on the market.

Judge Prather's initial opinion rendered after the trial was thirteen pages in length, nearly all of which had to do with disposing of the issues in the main case, *i.e.*, Powell's suit for rescission. Appearing almost to have been an after thought, with two sentences on page 12, and three sentences on page 13, Judge Prather wrote out his decision on the Nietmanns' cross action against Reynolds:

> By way of a cross complaint, defendants Nietmann seek indemnification against their agent Reynolds and Van Ooyen, d/b/a Sommerfeld Realty. The Nietmanns contend that they did not authorize their agents to make any representations concerning the sewer.
>
> The Court finds that the representations made by Reynolds were not authorized by his principles, the Nietmanns, and were not based upon statements or representations made by Nietmanns to him. Therefore, the Nietmanns should be indemnified by the defendants Reynolds and Van Ooyen, d/b/a Sommerfeld Realty, for any loss which they would

suffer as a result of the judgment entered herein in favor of the plaintiffs. Defendants Nietmann should be awarded a judgment against Reynolds and Van Ooyen for any sum paid to the plaintiffs herein by the Nietmanns in satisfaction of the judgment in favor of said plaintiffs.

Where brevity is concerned, Judge Prather's written decision making disposition of the indemnity action filed by the Nietmanns against Reynolds may very likely take its place along with Lincoln's Gettysburg Address, and Caesar's comment on passing over the Rubicon. Although Powell undoubtedly was entitled to prevail on his action for rescission, it is not by any means certain that the record sustains granting rescission on the grounds of intentional fraud. Powell was sold a property that, as he put it, was not "buildable," by reason of inability to obtain a building permit without approval of a sewer system. Had the Nietmanns pursued their appeal from the judgment granting rescission on the basis that fraud was not proved by clear and convincing evidence, or even by a preponderance for that matter, they would not have prevailed. The reasoning behind that statement is that this Court would have upheld the remedy of rescission on alternative grounds. Cases are legion where this Court has upheld a trial court judgment on the basis that, although the trial court erred, the judgment could and would be sustained on the proper grounds which were established. In deciding the indemnity action Judge Prather did not make the specific findings that this Court's rules require. As pointed out, it is a model of brevity, but it lacks much in clarity: "The court finds that the representations made by Reynolds were not authorized by his principles, [principals] the Nietmanns, and were not based upon statements or representations made by the Neitmanns to him." One has to resort back to the opinion deciding Powell's rescission in order to ascertain what "statements or representations" were made, and to whom.

At page 10 of his opinion, and noted *supra*, Judge Prather wrote: "The overall evidence shows that the Nietmanns and Reynolds were aware of the falsity of their

statements or should have known of the falsity thereof and made such representations in reckless disregard and without any effort to ascertain the truth thereof." That statement is, of course, well recognized as a statement of what constitutes actionable fraud. In short, here it amounts to a conclusion of law used as a cliche. As such it is overly broad and offers no assistance to an appellate court in attempting to review the findings for their sufficiency as justification for such conclusion of law, and in reviewing the evidence in order to ascertain whether substantial competent evidence supports the findings.

It simply does not do for a trial court to indulge in such loose language. Query: Is there any evidence that Nietmann made any statements to Powell? Judge Prather has provided us with a wholly ambiguous statement that Nietmann (along with Reynolds) made statements, presumably to Powell. Yet Judge Prather, at another place in his opinion, has stated as a finding that Nietmann had no contact whatever with Powell. It would seem, then, that the court could not possibly have written that Nietmann was aware of the falsity of his statements, statements that he is found not to have made. So much for that ambiguity.

Another blatant ambiguity is created by Judge Prather's use of the "or" word which is found in the cliche. His finding states that both Nietmann and Reynolds were aware of the falsity of their statements, he then equivocates by adding "or should have known the falsity thereof and made such representation in reckless disregard and without any effort to ascertain the truth thereof." Which is it? Knowingly made false statements, or, recklessly made statements without knowing whether or not the same were true? Judge Prather in using the cliche simply has shot down Nietmann and Reynolds with a scatter gun.

There is not an iota of evidence in the record which establishes conclusively by clear and convincing evidence that Nietmann made a false statement to anyone, either to Powell insofar as the rescission action is concerned, or to Reynolds in so far as the indemnity action is concerned. Similarly there is no evidence in the record to show that Reynolds made a false statement to Powell, insofar as the indemnity action is concerned. Nor, as to both Nietmann and Powell, can evidence be found which clearly and convincingly establishes that they were uttering false statements either knowingly or recklessly.

It is true, as anyone can perceive on reading Nietmann's testimony, that he was not too well aware, or, better stated, perhaps not too well made aware, that his lots did not have approval for a septic system, and probably would not be so qualified. It is easy to see that he was mixed-up. Judge Prather himself would later say, a month after writing his decision, that it was Panhandle Health's "wishy washiness in lack of clarity of language and speaking in their bureaucratic language which nobody understood is what brought all of the rest of those litigants in here."

There just is not in the record the quantity and quality of evidence which is necessary to uphold the statement which Judge Prather made as to the culpability of both Nietmann and Reynolds. As pointed out herein, Reynolds cannot be faulted for furnishing Powell with a copy of Bonner County Planning and Zoning's minutes showing that Nietmanns' lots had been approved for sewage disposal. Accepting that Powell at some pointed wanted assurance, as Judge Prather noted, if for some unknown reason Reynolds would not talk to him, or was out of the area, Nietmann upon being asked would have told Powell exactly what Reynolds said. And why not? There was not any wilful misrepresenting by anyone, Nietmann or Reynolds, to induce Powell into buying the property. There is no reason to believe, from the evidence in this case, that Reynolds was ignorant or a schemer, and in either event, so ill-advised as to make a sale that could not possibly stand because the property was not blessed with a building permit or sewage disposal clearance.

Returning to where I mentioned that a Nietmann appeal could not have prevailed, it is only necessary to say that this Court

would affirm, saying as it so often does, the district court was right, but for all the wrong reasons.

The granting of rescission would be affirmed on the basis that actual wilful fraud *is not the only ground* for awarding such equitable relief. Mistake has always been recognized as a basis for the equitable remedy of rescission. Where the transaction is an executory contract, breach of the contract may also give rise to the right of rescission. The district court in the same district where this action arose allowed rescission upon the sellers' unexplained four-year delay in furnishing the buyer with a policy of title insurance. *Blinzler v. Andrews* 94 Idaho 215, 485 P.2d 957 (1971).

There is an Idaho case which is startlingly similar to the one before us. In *Bethlahmy v. Bechtel,* 91 Idaho 55, 415 P.2d 698 (1966), this Court recognized "the doctrine of implied warranty of fitness insofar as construction of a house was concerned. Major defects which render the house unfit for habitation, and which are not readily remediable, entitle the buyer to rescission and restitution." 91 Idaho at 68, 415 P.2d at 111. Here, as has been noted, Powell's testimony was that without the property qualifying for a septic system of sewage disposal, the property was "unbuildable." It was on that basis that he was clearly entitled to rescission. Just as in *Bethlahmy* the evidence did not mount to the level of fraud, so here it falls even shorter. But in this case, as in that, there is a major defect, namely that the lot is not adaptable to a septic system; in this case as in that, the problem is not readily remediable; in this case as in that, there is a breach of the implied warranty of fitness, and, *ipso facto*, there was no basis for defending an action claiming the right to rescind.

The *Bethlahmy* opinion was unanimous. Authored by Justice Taylor it was also thorough and comprehensive. In addition to giving recognition to the doctrine of implied warranty, the opinion also dwelt at some length on the duty to disclose, which, as has been pointed out herein, was not fulfilled when, as Judge Prather found, Nietmann listed the property with Reynolds and Nietmann told Reynolds nothing concerning the sewage problem. Justice Taylor wrote:

In the tentative draft of the Restatement of the Law Second, Torts, considered by The American Law Institute at its annual meeting in May, 1966, § 551(1) is presented as follows:

(1) One who fails to disclose to another a thing which he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter which he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

and (so far as applicable here) subsection (2):

(2) One party to a business transaction is under a duty to disclose to the other before the transaction is consummated

(a) Such matters known to him as the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b) Such additional matters known to him as he knows to be necessary to prevent his partial statement of the facts from being misleading; and
* * *

(e) Facts basic to the transaction, if he knows that the other is about to enter into the transaction under a mistake as to such facts, and that the other, because of the relationship between them, the customs in the trade, or other objective circumstances, would reasonably expect a disclosure of such facts.

*Bethlahmy*, 91 Idaho at 59, 415 P.2d at 702.

*Bethlahmy* has not only been often cited by this Court, but also by the courts in other jurisdictions. Justice Donaldson wrote the most recent Idaho opinion citing to and almost wholly relying on *Bethlahmy. Tusch Enterprises v. Coffin*, 113 Ida-

ho 37, 740 P.2d 1022 (1987). While in this case Neitmanns initially pleaded alternatively for rescission or damages, in, *Tusch* the plaintiffs sought only the relief of damages on grounds which included, as here, misrepresentation, but also, as strangely omitted here, on other grounds which included implied warranty of habitability. *Tusch* stated that this Court did not believe that the misrepresentation claim should be analyzed only with reference to the usual elements, but then "[i]t must also be considered whether the facts here fall within the category of cases finding a misrepresentation on the basis of nondisclosure" meaning silence as a form of misrepresentation. 113 Idaho at 42, 742 P.2d 1027. In *Tusch* this court also noted in its discussion of *Bethlahmy*, at footnote 2, that the then tentative draft provision relied upon in *Bethlahmy* was adopted after only minor cosmetic changes. Those changes were indeed minor, and are not worth mentioning.

On this issue of implied warranty of habitability, Justice Donaldson wrote that even the vendors' disclaimers (if any, and in that case as in this case before us there are none), are in some instances rendered ineffective where contrary to the manifest intent of the parties. A specific holding of *Tusch* was, "Because the implied warranty is a creature of public policy, public policy dictates that it be waived only with difficulty. The party asserting it has been waived bears the burden of proving that it has been *knowingly* waived." 113 Idaho at 46, 740 P.2d at 1031 ("knowingly" emphasized by Justice Donaldson).

Part VB of the *Tusch* opinion dealt with to whom the implied warranty extended. Considerable was said therein which clearly has applicability to the rights and remedies of Powell on discovering that he was purchasing a lot upon which he could not obtain a building permit. *Tusch* stated,

> It is of no matter who ultimately inhabits the home after purchase, be it the buyer, a relative or lessee. The implied warranty is that the structure will be fit for habitation, and resolution of the question

whether the buyer has received that which he bargained for does not depend upon the status of the buyer or ultimate user; it depends upon the quality of the building delivered and the expectations of the parties. In transactions in goods, our Uniform Commercial Code implies warranties of merchantability and fitness for a particular purpose when certain circumstances are present. *See* I.C. § 28-2-314 and § 28-2-315 (1980). The focus must be upon the product, be it a typewriter or a home, and not upon the buyer. We see no reason for following *Hopkins*[3] consumer-investor distinction when the net effect would be to afford more protection to purchasers of chattels than purchasers of residential properties.

113 Idaho at 46, 740 P.2d 1031.

*Bethlahmy* and *Tusch* are strong medicine to cure ills suffered by buyers who have purchased real property with a defective building thereon, or the same ills suffered by buyers who have purchased real property which they find cannot even have a residence built upon.

As trier of fact, Judge Prather was empowered to pass on the credibility of the witnesses. But he was not at liberty to disregard testimony which was not inherently incredible. *Pierstorff v. Gray's Auto Body Shop*, 58 Idaho 438, 447-48, 74 P.2d 171, 175 (1938); *Swanson v. State*, 114 Idaho 607, 609, 759 P.2d 898, 900 (1988). Here Reynolds was the first witness called to stand by *Nietmanns'* counsel. He had also testified earlier as a witness called by Powell. In neither instance was he called as adverse party or as a hostile witness. He testified that he told the Powells that the lot in question required an engineered system. He also testified that he and Nietmann also discussed that same requirement. In a bench trial, the court necessarily does have to pass on credibility of witnesses, but here we are presented no statement explaining why, in Nietmanns' cross action against Reynolds, Nietmann was found the more credible.

3. *Hopkins v. Hartman*, 101 Ill.App.3d 260, 56    Ill.Dec. 791, 427 N.E.2d 1337 (1981).

Putting aside the trial court's questionable finding that the question of sewage disposal for the lot was not ever discussed between the seller, Nietmann, and his selected broker, Reynolds, which was based solely on the recollection of Nietmann, the court gave no consideration whatever to Nietmanns' failure to advise Reynolds as to the problems being encountered with obtaining sewage disposal approval when listing the property for sale. Moreover, on appeal, that facet of the case seems to attract only my attention. Although Justice Johnson correctly understands that active misrepresentation of material fact may serve as grounds for rescission, Idaho case law in addition thereto has accepted the proposition that "[t]he act of 'representing' may take many forms." *Sorenson v. Adams,* 98 Idaho 708, 715, 571 P.2d 769, 776 (1977). Nietmann in requesting Reynolds to sell Nietmann's lots was impliedly representing that the lots were marketable merchandise. While it is true that his testimony discloses a confused state of mind, it is clear enough that he had been cautioned by Bob Camp that he could not qualify his lots for a septic system. This important information should have been disclosed to Reynolds or any other broker to whom he happened to turn. "Even silence, in circumstances where a prospective purchaser might be led to harmful conclusions, is a form of 'representation.'" *Sorenson,* 98 Idaho at 715, 571 P.2d at 776. "In short, each party to a transaction must take care not to say or do anything tending to impose upon the other, and the mode of falsely representing a matter of fact is immaterial." 37 Am.Jur.2d 66, § 42 Manner of Making; Implied Representations. Those principles are equally applicable here. Even accepting that Nietmann and Reynolds had no conversation whatever about sewage disposal, as Nietmann testified and the trial court found, Nietmann's silence in not telling Reynolds of his problems with Panhandle Health, led to the exact "harmful conclusions" which were observed in *Brooks v. Jensen,* 75 Idaho 201, 270 P.2d 425 (1954), as being a form of representation. In over forty years of experience in law and real estate, I have never known it to be a required practice that real estate

brokers accepting a listing should cross-examine their clients relative to the approval the property being listed has for sewage disposal. In the instant case, while a reading of Mr. Nietmann's testimony might be convincing that he sincerely believed that sewage disposal would not be a problem, nevertheless it was a problem. At the least he should have mentioned the status of his negotiations with Health & Welfare. When he said nothing, any reasonable broker would have acted as did Mr. Reynolds. Moreover, there was no contention, or finding, that Reynolds was not acting as a reasonably prudent person in believing that Nietmann was listing a merchantable residential lake lot, meaning that it did have approval. In addition to that, Reynolds in furnishing the two exhibits attached to his letter was doing what any broker would do, furthering the interests of his client.

Judge Prather observed that the statement in the exhibit as to approval was false, but that was not the doing of Reynolds. Nor should there be any reason or necessity to check out the validity of a public document which facially presents no suspicion of defect. Yet that very statement of Judge Prather was undoubtedly the linchpin of his opinion.

Had the Nietmanns fully informed Reynolds as to their problems with obtaining Panhandle's approval of a sewage disposal system, and had Reynolds accepted their listing with the caveat that he was not authorized to say anything relative to Panhandle and the sewage problem, then, and only then would I accept the trial court's conclusion that Reynolds can be held liable for full indemnity to the Nietmanns by reason of any representation of material fact which was not true. But, that is not this case. As I say, and perhaps overstate, Nietmann by his mistaken understanding of how he was progressing with Health and Welfare, and failure to inform Reynolds thereof, was guilty of the misrepresentation which brought Reynolds into the litigation. It is not easy to conceive of a greater injustice being done than was done here, albeit the Nietmanns were, perhaps, as noted later by the trial court, to be somewhat

excused by the confusion which the trial court saw as being largely the fault of Panhandle. For myself, I see Mr. Camp's letter as being explicitly clear, but Mr. Nietmann most apparently was dealing in a foreign field. What is all too clear is that Mr. Reynolds did nothing wrong, and yet, even in this Court, is still being penalized to some extent.

As mentioned earlier, the trial court's decision on the indemnity issue is very short. The *ratio decendi* is even shorter: "The Court finds that the representation made by Reynolds were not authorized by his principles (principals), the Nietmanns...." As a general principle of law, that is not an unsound statement. But in this case it presents an unsolved enigma. The court went on to add as to the representations, "and were not based upon statements or representations made by the Nietmanns to him."

For one thing, a nice question is raised. If Nietmann did not make the statements to Reynolds, who did? This also stretches the credibility of Mr. Nietmann's deposition testimony that the sewage disposal problem was not discussed, and places the trial court in a self-contradictory position. The one thing that can be said for certain relative to the conflicting testimony of the main witnesses, is the testimony of Mr. Nietmann that, as to the representations Powell said were made by Reynolds to him, Nietmann did not see that Reynolds had said anything which he, Nietmann, thought not true, plus that had Powell talked to him, he, Nietmann, would have given the same answers.

In closing, particular care is taken to observe my inability to agree with the district court's reassessment of the initial decision which held Reynolds liable for having made the same statements which his principal, Nietmann, would have made if asked the same questions by Powell. With ample time for reflection, Judge Prather continued his original theme of liability:

> This case is unique in that the statements made by Reynolds to the Plaintiffs appear to have been the same statements that the Nietmanns would themselves have made if they had talked with the Plaintiffs. This, because both the Nietmanns and the real estate brokers were relying upon the language and phrases used by the Panhandle Health District concerning an 'engineered system' or a 'specially approved system.' It turns out that neither the Nietmanns nor Reynolds correctly understood what these terms meant and what the effect of them was. Yet, Reynolds undertook to explain them to Plaintiffs to allay their fears and concerns. In this court's mind the key question as concerns the rights between the Nietmanns and the real estate agents is that these things were not discussed between them and thus it cannot be said that the Nietmanns ever authorized Reynolds to make the statements. This, even though the Nietmanns would have made the same statements themselves if questioned by the Plaintiffs. The determination of liability between the Nietmanns and their real estate brokers turns upon what the brokers were authorized by their principal to say. The court adheres, after reexamination of the evidence at trial, to its original conclusion that there was never any authorization given by the Nietmanns to Reynolds to make the representations which he did. Therefore, Reynolds is liable to indemnify the Neitmanns for any losses they suffer because of his unauthorized representations to the Plaintiffs.

It is wholly illogical to hold Reynolds, or anyone, responsible to Nietmann for saying to Powell the same thing that Nietmann would have said, if asked, even were it not seen that the Nietmann's testimony is far from clear and convincing as Idaho case law has required. *Gneiting v. Clement*, 96 Idaho 348, 528 P.2d 1283 (1974); *Zuhlke v. Anderson Buick Co.*, 94 Idaho 634, 496 P.2d 95 (1972); *Smith v. King*, 100 Idaho 331, 597 P.2d 217 (1979), and in fact is confused, unsubstantiated, contradictory, self-serving, and of bare persuasion. *Ballard v. Lava Hot Springs Resort*, 97 Idaho 572, 577, 548 P.2d 72 (1976).

The highlight of these facts and circumstances is that the evidence does not estab-

lish that either Nietmann or Reynolds knowingly, wilfully, or intentionally deceived Powell into entering into a contract to purchase the sewerless lot. Simply putting the property on the market raised an implied warranty of habitability, which the property could not fulfill. Nietmann, however, presumably on advice of counsel, made the election to not agree to a rescission when asked. He resisted further when the action was commenced. Neitmann's failure to accede to the Powells' request for rescission is wholly indefensible. Definitely at fault in foolishly turning deaf ears, he in turn sued both Reynolds and Panhandle Health. Losing, as lose he must, he then commenced an appeal which he did not pursue, probably because he had been awarded a judgment against Reynolds which over-indemnified him. As Justice Johnson has pointed out, the defense of the Powell action, if there was to be any made, was not tendered to Reynolds, who in turn Nietmann was claiming against. Yet at trial Nietmann would call Reynolds as his first witness. Reynolds, as I understand from the briefs and the appeal record, had at all times been willing to forego the $4500 commission which would be his for making the sale. Nietmann, in his equitable cross-action against Reynolds, is without any equitable right to pass off onto Reynolds his unnecessarily incurred judgment for attorney fees, court costs, or anything.

My vote is that the judgment against Reynolds be reversed and the cause remanded with directions to enter judgment of dismissal in favor of Reynolds.